JOHNSON, Judge.
Eagle Star Insurance Company, one of the plaintiffs, has appealed from the judgment of the Civil District Court for the Parish of Orleans dismissing the civil action against Sears, Roebuck and Company, in which action plaintiffs, Louis E. Smith and his fire insurance carrier, seek to recover damages caused by a fire in plaintiff Smith’s home in the early morning of December 14, 1963. Smith was granted an appeal but he did not perfect it.
The petition of plaintiffs alleges that while the central heating system in the attic was being used the furnace became overheated in December, 1962, after which defendant made repairs and installed certain parts; that Smith did not use the heater after it was repaired in March (the repairman and his record show he completed the repairs on February 16, 1963) until December 1963, when on the night of December 13 the heater again overheated and caught fire, setting fire to the home causing considerable damage in the attic; that plaintiff Smith occupied the home from the time it was purchased by him until the time of the fire; that the heating system was not tampered with or damaged by anyone prior to the fire in December 1963, except that defendant’s repairman worked on the heater in February 1963; that plaintiff Eagle Star Insurance Company had previously issued to Smith a fire insurance policy under the provisions of which it paid to Smith part of the loss and was sub-rogated to Smith’s right of action against this defendant in the amount of the payment; that the insurance company joined in this suit as plaintiff to recover the money. In the suit Smith claims an additional amount not covered by the insurance. The petition further alleged negligence on the part of defendant’s employees in making th.e repairs. In the alternative plaintiffs invoke the doctrine of res ipsa loquitur.
The defendant’s answer generally denies plaintiffs’ allegations and alleged that after it sold the appliance to Wallace Fernandez, Smith’s ancestor in title to the home, in August 1959, (the sale was actually made in June 1959), the heater gave satisfactory service until December 1962; that in that month defendant was called upon to check the unit; that in February 1963, it installed certain parts, checked the operation and left it operating properly; that the fire which damaged plaintiff’s home was in no way caused by reason of any repairs performed by defendant’s servicemen, and that there were other causes which could have started the fire. Defendant implead-ed Central Service; a partnership and the individual partners, by third-party petition, alleging that Central Service installed the *791 unit in the Fernandez home for Sears by contract and that if there were any defects or damages resulting from negligence by Central Service it was a breach of the implied warranty of Central Service to defendant.
The judgment dismissing plaintiff’s suit also in turn dismissed defendant’s third-party action against Central Service.
The evidence disclosed that Mr. Fernandez bought this heating-air conditioning appliance and had it installed in this home in June 19S9. Fernandez sold the house to Smith in November 1962, and Smith operated the unit without any trouble until the night of December 24, 1962, when the Smiths smelled an unusual odor. Smith got a ladder, opened the trap door to the attic where the unit was installed and discovered the heater was red hot. He came down and cut the heater off at the wall, meaning the thermostat. He got a pail of water and some towels, went back to the attic and wet the rafters and joists because they were getting scorched from the heat of the furnace. After he turned the unit off at the thermostat and went back to the attic the heater was cooling down. At one point of his testimony he said that after he cut off the electricity at the thermostat he noticed the gas burners were still burning and he had to turn off the gas at the heater to stop the burners to cool the unit. At another point he said this earlier testimony was incorrect and that the only thing he had to do to cool the unit was to turn off the thermostat. This incident of overheating must not have been very bad because he said that after he put the wet towels on the rafters he and his wife went to a Christmas Eve party until a late hour.
This home was small, only 800 square feet, and the space in the attic was not high enough to enable one to stand erect. The heater was sitting on small blocks called vibration isolators, which rested on decking of one by eight boards laid across the ceiling joists. This arrangement held the heater about three-quarters of an inch above the decking. The clearance between the top of the heater and the rafters over it was about four inches.
The city inspector, Edward Zimmer, inspected the installation of the new central heating system on July 17, 1959, after it was sold to Fernandez in June 1959. The inspector approved the installation. A year or so later the city adopted more stringent installation specifications which required much greater space beneath and above the heater.
The brief of counsel for plaintiff, Eagle Star Insurance Company, contains a concise description of the manner in which the heater operates, as follows:
“The operation of a central heating system is rather simple. In the hall is located a thermostat. This thermostat is wired to the unit in the attic. When the temperature gets down to the level set on the thermostat an impulse is sent to the unit in the attic. The gas goes on and the burners in the combustion chamber ignite. When the heat within the combustion chamber reaches a prescribed temperature a fan blower is activated. The blower dispels the heat from the combustion chamber through the duct work and out into the rooms of the house. When the house heats to the prescribed temperature the mechanism in the thermostat sends another electrical impulse to the heater and the gas goes off. The fan blower continues to operate until the heat within the combustion chamber is dispelled. Then the fan goes off. This cycle is repeated whenever there is a demand from the thermostat.”
After the overheating episode, Sears, Roebuck and Company was called and a serviceman, Lawrence Butler, went to the home, examined the heater and determined the seal of the chamber was scorched and *792 that the fan needed a new switch. He said if the fan had operated properly the unit could not have become overheated because the fan would blow the heat into the ducts even if the burners didn’t automatically cut off as they should when the combustion chamber heated to high temperature. The unit contained a high temperature limit switch which should automatically close the gas valve if the combustion chamber reached a high temperature and if the fan failed to blow out the hot air. The high limit switch and the fan switch were combined in one item. Butler did not have these parts in his truck and he wrote an order to the warehouse to furnish them. Butler did not install the parts. Mr. Wie-fel was the serviceman who picked up the order, obtained the parts and installed these parts on February 2, 1963. At that time he learned that the condensing device was not operating properly. He ordered the component parts and returned on February 16th to install them. After installing all the parts he turned the heater on and it performed through the cycle properly. The gas valve opened and closed and the fan came on and stopped, all at the proper times. He told the Smiths that the heater was ready for use. Plaintiff Smith and his wife testified that they did not use the central heating system any from the day Mr. Wiefel completed the repairs until the first part of December 1963, when they turned it on for the first time that winter. We strongly doubt the truthfulness of that statement. The Smiths thought that Wie-fel completed his installations in March, but we are convinced from Mr. Wiefel’s testimony and the work order, which shows the date, that the repairs were completed, the unit tested and the Smiths were advised that it was working in good order, on February 16, 1963. The Smiths said that after they turned the heater on, about the first part of December 1963, it performed satisfactorily for about two weeks. In the early morning of December 14, about one or two o’clock, the dog began to bark. Smith thought there might be prowlers. He went to the front door and when he opened it he discovered fire coming from under the eaves of the house. The fire department came and soon extinguished the fire, thereby confining it to the attic.
After the fire, the adjuster for the insurance company employed L. L. Denson, an expert engineer, who went to Smith’s home on two occasions, December 28, 1963 and January 7, 1964, to inspect the situation to determine the cause of thé fire. He said it was very obvious that the fire originated in the vicinity of the forced air furnace. The decking beneath the furnace and the rafters above it were the only portions of the structure almost completely destroyed by the fire. Going away from the combustion chamber the wood was burned less. The fan belt was burned up, the control wire insulations were burned away. There was extensive damage to the furnace from heat. The nameplate was burned away. The fan roller with the shaft which carries the fan wheel was frozen and it could not be turned by hand. The motor could not be turned. The controls (switches) were completely destroyed and could not be examined to determine their condition. He said this was the clearest case of the furnace setting fire to the building he had ever seen.
Mr. Denson’s first conclusion was that the fault was in the gas valve. He further concluded that there was nothing wrong with the high limit switch. He based this opinion on Smith’s first statement that when he cut off the electricity he noticed the gas continued to burn in the furnace. Reliance upon Smith’s statement was an erroneous premise because the trouble with that basis is that Smith changed that testimony and later said that statement was incorrect, then maintaining that when he cut off the unit' at the thermostat the burner did go out and the furnace cooled off without his doing anything else. Our comment right here is that Mr. Butler, defendant’s repairman who first inspected the unit on December 29, 1962, after it over *793 heated, said he attributed the trouble to the combined fan and high limit switch and ordered a new item which contained both. The new controls were installed by repairman Wiefel on February 2, 1963, and then on February 16, when he installed some other parts he tested the operation of the unit and it worked properly throughout the cycle. It was reasonable to assume that, after installing the switch and the unit worked properly in all parts, there was nothing the matter with the gas valve. Moreover, Butler said the reason he did not examine the gas valve was that it was so constructed that it could not be disassembled. No fault can now be charged to him for not putting in a new one, because the gas valve worked properly after the new switches were installed and continued to do so until ten months later when the fire occurred. Mr. Denson also said that the rubber and cork vibration isolators were only three-quarters of an inch high between the decking and the bottom of the furnace and that this did not provide sufficient space for proper insulation between the bottom of the furnace housing and the decking. It must be remembered that it did meet the requirements of the city in July 1959, but the city did increase that space requirement by codal change.
Then on page 203 of the testimony Mr. Denson expressed his opinion that the fire was caused by the improperly operating fan and the sticking gas valve. He said if the fan were operating properly the furnace never would overheat because the fan would continue to remove the air. We comment again that defendant’s repairman took care of that defect by installing a new fan switch after which the fan performed its function and the gas valve opened and closed at the proper times.
Mr. Denson explained that at the time of writing his report to his employer he gave the defective blower (fan) as one of several possible causes of the fire and after hearing the testimony (of Smiths) he formed a fixed opinion that the blower was not turning at proper speed, and that, in combination with the defective high limit switch, these two factors, with a defective gas valve, which remained open, caused the fire. He then retracted his opinion that the high limit switch was at fault because he had said previously that the whole fault was the gas valve which should have closed when the electricity was cut off.
As we understand it, when the furnace reached a high temperature the high limit control should send an electrical impulse to the gas valve to close it, and if there is nothing the matter with the high limit switch and it does send that message to the gas valve and the gas valve remains open with the gas continuing to burn, it would be reasonable to say that the fault was a sticking gas valve. But suppose there is a defect in the control switch which prevents it from sending the electric current to close the gas valve, it is impossible to understand how cutting off the electricity at the thermostat could close the valve. If the defective high limit switch could not carry the current to the valve with the electricity connected at the thermostat, the defective switch certainly could not carry the message from the thermostat to the valve and close it with the electricity cut off and disconnected. When Mr. Denson eliminates entirely the possibility of a defect in the high limit switch, his opinion becomes worthless. He says with positive assurance that the overheating of the furnace in December 1962 and the fire in 1963 were from exactly the same cause, a sticking gas valve. The component parts of the unit were so badly damaged by the fire that he could make no examination or tests of them from an engineering standpoint. Therefore, his opinions were purely guesswork and his expert knowledge adds little weight to his opinions. Mr. Denson’s various opinions as to the cause of the fire, his revision and retraction of opinions leave the very definite impression that he has merely recited possible causes of the *794 fire. If we accept all of his possible reasons as actual conditions and causes, the evidence falls far short of being sufficient to convict defendant’s employees of negligence in connection with what they did when they did it.
We have already referred to contradictions of the testimony of plaintiff Smith on certain points to demonstrate his fallibility. On the subject of suggested defects in the fan, Smith testified in his discovery deposition that while they did not use the heater, they did use the air conditioning all summer and that they had no trouble with the unit whatsoever. The fan is an important part of the air conditioner. In his testimony as a witness at the trial he and his wife endeavored to describe inadequate air supply which presumably would be the fault of the fan. This sounds like an afterthought.
Plaintiffs’ have invoked the doctrine of res ipsa loquitur by alleging that:
“Petitioners had nothing to do with the installation or repair of the heating system, or its controls and therefore are not aware of the facts surrounding same, but such facts are peculiarly within the knowledge of defendant.”
Evidently this allegation refers to the overheating incident in December 1962. But the accident which caused plaintiff Smith’s damage occurred in December 1963. In order to rely on this doctrine we must hold that the evidence discloses clear grounds for the inference of negligence on the part of defendant committed in December 1962 and February 1963, which negligence caused or resulted in the fire in December 1963. There is certainly no proof of negligence. There is some speculation of a general character, but it is our opinion that the evidence does not warrant the presumption that defendants’ employees did or failed to do something that resulted in this fire and that defendant is required to offset such presumption.
On this subject, it is the consensus of court decisions that the doctrine must not be applied unless the demands of justice require it, because it is a jurisprudential modification of the rule of evidence that negligence must be clearly and affirmatively established.
The trial judge said in his written reasons for judgment, with which we agree, that:
“* * * Court feels that the courts in the Plunkett [Plunkett v. United Electric Service, 214 La. [145] 149, 36 So.2d 704 [3 A.L.R.2d 1437]] and Mosely [Mosely v. Sears, Roebuck and Company [La.App.] 167 So.2d 408] cases extended the possession test and allowed application of the doctrine of res ipsa loquitur on a theory that the time period was so short and the circumstances were such that it was practically impossible for any intervening factors to have caused the fire from the time the instrumentality which caused the damages left possession and/or control of defendant. However, this Court feels that as you extend the period of time from which control is not in the defendant, the increased possibility of intervening factors come into play and at some point you can no longer extend the application of the doctrine without doing serious damage to our theory of tort law. We must bear in mind that tort liability in this State is predicated solely on statute and the basic fundamental law relating thereto is contained in L.S.A.-C.C. Articles 2315 and 2316. Under these Articles an injured party must show fault, negligence, imprudence or want of skill by the party against whom he seeks judgment. While the doctrine of res ipsa loquitur has been increasingly used in recent times as an aid in determining fault under certain conditions, we must not forget that it is purely a jurisprudential rule of evidence and is not a rule of substantive law.”
*795 We believe that this heater with its component parts was in good order when defendant’s employees completed their installation on February 16, 1963. The Smiths say it operated only two weeks by making it appear that defendant did not complete its work until sometime in March and they did not need the heater until December. It is definite that the last day any work was done on this heater by defendant was February 16, 1963. It stands to reason that the winter was not over on that date and the Smiths are probably mistaken in placing the commencement of the heater’s use in December. The fan of the unit operated in the air conditioner throughout the summer. Be that as it may, there are a number of things that could start such a fire as the firemen could have explained had they been called. For one thing Mr. Wiefel testified that there were uninsulated spliced wires on the floor in the attic and also under the heater. It is general knowledge that such a condition is dangerous. It could be that other parts of the unit gave way. It is common knowledge that low priced motors must be lubricated occasionally, and rats pack matches and combustible materials. Possession and control of a thing is not always a determining factor, but in this case we believe it is important. There was no duty on defendant to make periodic inspections and services and the time element must be taken into consideration along with the other points mentioned. The doctrine of res ipsa loqui-tur is not applicable in this case. Pearl Assurance Co. v. Reily, La.App., 127 So.2d 266; Wilson v. Eagle Gas Company, La. App., 154 So.2d 270; Bass v. Jones, La. App., 170 So.2d 181; Kansas City Fire and Marine Insurance Company v. Bituminous Casualty Corporation et als., La.App., 209 So.2d 785, handed down this day.
For these reasons, the judgment of the Civil District Court for the Parish of Orleans is affirmed with costs of appeal to be paid by plaintiff, Eagle Star Insurance Company.
Affirmed.